## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **2:14-cr-00138-JDL** |
| **MARQUIS AIKEN** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **JOSHUA BONNETT,** | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON SECOND RECOMMENDED DECISION ON MOTIONS TO SUPPRESS

Defendants Marquis Aiken and Joshua Bonnett are charged with possession with intent to distribute a mixture or substance containing cocaine base, and aiding and abetting such conduct, in violation of 21 U.S.C.A. § 841(a)(1) (2015) and 18 U.S.C.A. § 2 (2015). ECF No. 1. They seek to suppress all evidence obtained as a result of the search of Room 218 of a motel in Lewiston on November 7, 2014. ECF No. 49; ECF No. 53. The United States Magistrate Judge recommended that the motions to suppress be denied on the merits, ECF No. 142 at 1, to which the Government and the defendants have each filed objections. ECF No. 150; ECF No. 151; ECF No. 152. I have carefully reviewed and considered the Magistrate Judge's recommended decision and the parties' objections, and have made a *de novo* determination of the matters objected to, in accordance with 28 U.S.C.A. § 636(b)(1) (2015). For the reasons discussed below, I conclude that the defendants' motions to suppress should be granted.

## I.  STATEMENT OF FACTS

I make the following findings based upon my review of the evidentiary record.

At 7:00 a.m. on November 7, 2014, Thomas Pappas, a Maine State Trooper and agent with the state drug task force, received a tip from a reliable informant that drug trafficking activity was taking place at a motel in Lewiston, Maine.  ECF No. 104 at 34:14-35:2.  Pappas had been to the motel many times on drug-related calls, and he knew it was common for out-of-state drug dealers to stay there.  *Id.* at 35:17-22.  The tip from the informant indicated that a man and woman in Room 216 had large bags of crack, cocaine, or heroin.  *Id.* at 36:13-19.

Pappas and Nicholas Gagnon, another drug task force agent, went to the motel and learned the identity of the individual who was registered as the occupant of Room 216.  *Id.* at 37:14-20.  That individual was known to Agents Pappas and Gagnon as a drug and gun trafficker in the Lewiston, Maine area.  *Id.* at 37:24-38:3.  The agents confirmed that the individual was subject to bail conditions authorizing random searches, and they decided to search him and his room for evidence of bail violations. *Id.* at 39:6-15.

Wearing plain clothes, the agents knocked on the door of Room 216 at approximately 9:00 a.m.  *Id.* at 41:4-8, 42:3.  Receiving no response, they continued to knock, progressively more loudly, for up to two minutes.  *Id.* at 41:12-24.  As they knocked on the door to Room 216, the door of the adjacent room, Room 218, opened slightly.  *Id.* at 43:3-5.  The agents detected the smell of burnt marijuana emanating from Room 218.  *Id.* at 43:13-14.  They observed that the security bar lock remained

2

in place on the door to Room 218.  *Id.* at 43:8.  Pappas did not recognize the man at the door, and he told the man that he wasn't there for him.  *Id.* at 43:24-44:4.

The agents continued to knock on the door of Room 216.  Another confidential informant known to the agents opened the door of a room farther down the hallway, and told the agents that there were drugs in Room 216.  *Id.* at 45:6-14.  The agents did not hear any sounds coming from Room 216.  As they continued to pound on the door to Room 216, the door to Room 218 again opened, this time fully, and the agents again detected the smell of burnt marijuana.  *Id.* at 48:4-15; 101:3-7.  Pappas saw defendant Joshua Bonnett standing in the doorway of Room 218, with his left hand behind the door.  *Id.* at 49:1-4.  Standing behind Bonnett inside the room was defendant Marquis Aiken, *id.* at 49:8-12, who was about five or ten feet from where Pappas was standing, *id.* at 51:4-14.  Pappas and Gagnon did not recognize Bonnett, but they did recognize Aiken, who they had arrested for possession or trafficking in heroin in April, though the charge in that case had been dismissed in July.[1]  *Id.* at 30:17, 129:23-130:6, 188:7-20.  Aiken recognized the agents.  *Id.* at 61:3-16.  Aiken appeared to the agents to be very nervous. *Id.* 55:23-56:2, 56:24-57:3.

Pappas identified himself as a police officer and told the men that he smelled marijuana.  *Id.* at 52:6-7, 53:3-4.  Aiken's presence in the motel room led Pappas to suspect that "there was possibly more going on inside that room besides marijuana." *Id.* at 52:7-9.  He wanted to investigate "what[ was] going on in that room and as to why Mr. Aiken was in that room."  *Id.* at 53:20-22.  Bonnett remained standing at

---

[1] Pappas testified that the charge was later refiled, but there was no pending charge as of November 7, 2014.  ECF No. 104, at 34:5-13, 129:24-130:6.

the door with his left hand behind the door, although he eventually moved his hand, dropping an unlit marijuana cigarette, and the agents could see that Bonnett was not holding a weapon.  *Id.* at 199:19-24, 220:24-221:1, 238:17-19, 239:5-8.

Pappas asked both men to step out of the room so that he could conduct a further investigation.  *Id.* at 53:16-22.  Aiken, who was dressed only in shorts, began to dress, putting his clothes on and then his shoes.  *Id.* at 107:18-24; 157:8-10.  When the two men did not immediately come out of the room, *id.* at 57:16-17, Pappas told them he was there for an investigation, that he was not going to leave, and that "either you guys come out or I'm coming in."  *Id.* at 57:19-22.  When neither man came out of the room, Pappas and Gagnon entered through the open door.  *Id.* at 58:4-22. Neither Aiken nor Bonnett had given the agents permission to enter the room.  *Id.* at 155:2.

The encounter—from when the agents first observed Aiken in the room to when the agents directed the men to exit—lasted less than one minute.  *Id.* at 55:4-7.  Pappas testified that he entered the room to make sure no one else was present, and to prevent the defendants from fleeing or destroying evidence.  *Id.* at 63:16-17. The agents did not have their weapons drawn or visible when they entered the room. *Id.* at 53:8-13.  When the agents entered the motel room, they understood that they lacked probable cause to arrest Bonnett or Aiken.  *Id.* at 104:3-5, 130:23-131:4, 222:1-4.

Once inside the room, the agents conducted a security sweep.  *Id.* at 62:23-63:5. They did not observe any weapons or other people inside the room, *id.* at 65:16-21,

4

but they did observe a bag containing a small quantity of marijuana on one of the beds, as well as a digital scale containing white powder on the top of a nightstand between the two beds, *id.* at 68:8-12, 166:12-18.

At this point, Aiken started yelling nonsensically and Bonnett began to cry. *Id.* at 62:13-20. Due to Aiken's emotional response, Gagnon placed him in handcuffs. *Id.* at 66:1. After being handcuffed, Aiken stopped yelling. *Id.* at 208:11-15. The agents also conducted pat down searches of both men for weapons, finding none. *Id.* at 67:15-22. Bonnett sat on the floor near the desk behind the door, as he had been directed. *Id.* at 225:6-15, 206:16-18.

Pappas asked the two men if there were any other drugs inside the room. *Id.* at 68:2-4. Pappas and Gagnon then pointed to the drawer of the nightstand, and at least one of them asked whether there was crack in the drawer, or how much crack was in the drawer. *Id.* at 208:25-209:3. Aiken responded by denying that there were other drugs in the room, and he told the agents that they could look in all the drawers. *Id.* at 71:2-5.

Pappas opened the top drawer of the nightstand and discovered a bag containing what appeared to be approximately one-quarter to one-half of a kilogram of cocaine base. *Id.* at 72:16-73:2. He then told the defendants that he intended to obtain a search warrant. *Id.* at 72:16-18. Pappas left the motel to prepare the warrant application, while Gagnon stayed in the room. *Id.* at 78:4-9. Two uniformed officers arrived who then brought Aiken and Bonnett to the jail. *Id.* at 78:12-15. A search warrant was approved, and a subsequent search of the room yielded, in

5

addition to the cocaine base, receipts for bus tickets for Aiken, Bonnett, and another person in whose name the room was registered, and a Pennsylvania driver's license in the other person's name.  *Id.* at 77:3-21.

## II.  PROCEDURAL BACKGROUND

The Magistrate Judge filed a previous recommended decision in this case, which recommended that the motions be denied on the basis that the defendants lacked standing to challenge the search.  ECF No. 99 at 5-9.  I declined to adopt this first decision, and recommitted the matter to the Magistrate Judge for a recommended decision on the merits.  ECF No. 135 at 4.  After further argument, the Magistrate Judge filed a second recommended decision.  ECF No. 142.  The Magistrate Judge found that the agents had probable cause to search the motel room, but that the Government had not established the existence of exigent circumstances to justify the warrantless entry.  *Id.* at 2-7.  The Magistrate Judge also found, however, that Aiken had consented to the search of the room, and that his consent rendered the search that ensued lawful.  *Id.* at 7-8.

The Government and the defendants each filed objections to the Magistrate Judge's second recommended decision.  ECF No. 150; ECF No. 151; ECF No. 152. The defendants challenge the Magistrate Judge's finding that Aiken's consent was voluntary, and argue that the consent was, in any event, fruit of the poisonous tree because it was a result of the agents' illegal entry.  *See* ECF No. 150; ECF No. 152. The Government objected to the Magistrate Judge's conclusion that there were no exigent circumstances to justify the warrantless entry.  ECF No. 151 at 2-5.

Oral argument on the objections was held before me on September 23, 2016. Under 28 U.S.C.A. § 636(b)(1), I have made a de novo determination of the factual and legal issues raised by the objections. *See United States v. Lawlor*, 406 F.3d 37, 40 (1st Cir. 2005).

## III.  LEGAL ANALYSIS

A search conducted without a warrant is presumed to be unreasonable under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quotation omitted).  The Government bears the burden of proving that an exception to the warrant requirement applies. *See United States v. Dickerson*, 514 F.3d 60, 66 (1st Cir. 2008).  Here, the Government argues that two established exceptions apply: exigent circumstances and consent.  ECF No. 57 at 10, 12.

## A.    Exigent Circumstances

The Government cites three reasons to support the application of the exigent circumstances exception to the warrant requirement in this case: first, the agents' belief that Aiken and Bonnett would destroy evidence in the time it would take to obtain a warrant; second, the agents' concern for their own safety; and third, the risk that one or both of the defendants would flee.  ECF No. 151 at 3-5.  The exigent circumstances exception applies to situations in which there is "a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Almonte*, 952 F.2d 20, 22 (1st Cir. 1991).  Four of the commonly recognized categories of exigent circumstances include: "(1) risk to the lives or health

of the investigating officers; (2) risk that the evidence sought will be destroyed; (3) risk that the person sought will escape from the premises; and (4) 'hot pursuit' of a fleeing felon." *United States v. Beaudoin*, 362 F.3d 60, 66 (1st Cir. 2004), *vacated and remanded on other grounds sub nom., Champagne v. United States*, 543 U.S. 1102 (2005). Exigent circumstances "turn upon the objective reasonableness of *ad hoc*, fact-specific assessments contemporaneously made by government agents in light of the developing circumstances at the scene of the search." *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 545 (1st Cir. 1996) (quoting *Hegarty v. Somerset Cty.*, 53 F.3d 1367, 1378 (1st Cir. 1995)). For the exception to apply here, the Government must show that the agents had probable cause to believe that evidence of a crime was present in the motel room, and that exigent circumstances supported the need for an immediate, warrantless entry. *See Welsh v. Wisconsin*, 466 U.S. 740, 741 (1984). Because the exigent circumstances exception requires the existence of probable cause, I consider that issue first.

### 1. Probable Cause

"Probable cause exists where the facts and circumstances as to which the police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." *Robinson v. Cook*, 706 F.3d 25, 32 (1st Cir. 2013). Here, the agents were not interested in investigating Room 218 based on the possible presence of a small quantity of marijuana. They understood that at the time they entered the motel room, they could have issued Aiken and Bonnett summonses for possession of marijuana, but that they

did not have probable cause to arrest them for possessing marijuana. ECF No. 104 at 153:23-154:5. Rather, they entered the room because Aiken's presence led them to believe that, as Pappas testified, "there was possibly more going on" than marijuana possession and they wanted to question Aiken. *Id.* at 52:6-9. Because the "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed," *Welsh*, 466 U.S. at 753, the information the agents had regarding Bonnett and Aiken's use or possession of marijuana was not, standing alone, sufficient under the Fourth Amendment to justify their warrantless entry, regardless of whether that information would have been sufficient to obtain a search warrant if the same had been presented to a judge.[2]

When Pappas informed Bonnett and Aiken that if they failed to exit the motel room the agents would come in, the agents had knowledge of the following:

- Their knocking on the door of Room 216 had elicited the interest of an occupant or the occupants of Room 218, who twice opened the room's door to observe the police. ECF No. 104 at 42-44, 47-49.

- The agents smelled burnt marijuana coming from Room 218 when the door was partially opened, indicating that an occupant or the occupants had recently smoked or were smoking marijuana. *Id.* at 43.

---

[2] The Government does not contend that the agents' entry into the motel room may be justified for Fourth Amendment purposes by the less-demanding *Terry* standard of a reasonable articulable suspicion of unlawful activity. *See Payton v. New York*, 445 U.S. 573 (1980) (noting that residential searches and seizures must be supported by both probable cause and either a warrant or exigent circumstances).

- The door to Room 218 opened a second time and the agents saw and recognized Aiken. *Id.* at 48-49.

- Aiken appeared to be extremely nervous as soon as he made eye contact with and recognized Pappas. *Id.* at 109:14-16.

- Agent Pappas ordered Aiken and Bonnett to exit the room, but they failed to immediately do so. *Id.* at 57:19-58:22.

The parties have identified two lines of decisions that bear on whether the preceding information established probable cause that evidence of a crime more serious than a minor offense would be found in Room 218. The first concerns the smell of burnt marijuana in automobiles, and the second concerns the smell of burnt marijuana coming from a residence or motel room.

### i. Smell of Burnt Marijuana in Automobiles

In arguing that the agents had probable cause to search Room 218, the Government relies on *United States v. Staula*, 80 F.3d 596, 602 (1st Cir. 1996), in which the court held that the odor of burnt marijuana coming from an automobile is sufficient to give an officer probable cause to search the automobile. The Magistrate Judge relied principally on *Staula* in concluding that the smell of burnt marijuana coming from the motel room, considered together with the other information known to the agents, gave rise to probable cause to search. ECF No. 142 at 3.

The protections of the Fourth Amendment apply with greater force in the context of a home than they do to an automobile driven on a public highway. *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) ("when it comes to the Fourth

Amendment, the home is first among equals"); *see also Staula*, 80 F.3d at 602 (noting that "[a] police officer may effect a warrantless search of the interior of a motor vehicle on a public thoroughfare as long as he has probable cause to believe that the vehicle contains contraband"). The odor of burnt marijuana, when detected in an automobile, is evidence of more than simple possession of marijuana; it is also evidence that the driver of the automobile may be intoxicated, a separate offense that presents an immediate public safety risk.[3] In addition, automobiles are inherently mobile, making it more difficult to secure evidence while officers investigate further or apply for a search warrant. *See United States v. Panitz*, 907 F.2d 1267, 1271 (1st Cir. 1990) (citing *California v. Carrey*, 471 U.S. 386, 392 (1985)). For these reasons, occupants of automobiles stopped on the road receive less Fourth Amendment protection than do the residents of a home or guests in a motel room. *See Stoner v. California*, 376 U.S. 483, 490 (1964); *Beaudoin*, 362 F.3d at 65 (observing that a hotel or motel room is usually treated as a person's "temporary home" for Fourth Amendment purposes). Accordingly, I conclude that *Staula* does not control the determination of whether the smell of burnt marijuana establishes probable cause for purposes of the application of the exigent circumstances exception in this case.

### ii. Smell of Burnt Marijuana in Residences and Motel Rooms

In *Johnson v. United* States, the Supreme Court concluded that the smell of opium, without more, was not sufficient to support a warrantless entry by police into

---

[3] I also note that in Massachusetts in 1993, when the events described in *Staula* took place, possession of any amount of marijuana was a crime under both state and federal law. *See* M.G.L.A. ch. 94C, § 34 (1996).

an apartment. *See* 333 U.S. 10, 14 (1948). More recently, five Federal Circuit Courts have issued decisions that considered the extent to which the odor of burnt marijuana establishes probable cause in connection with the search of a residence or motel room for purposes of the exigent circumstances exception.

In *United States v. Mongold*, the Tenth Circuit concluded that the odor of burnt marijuana, coupled with complaints from neighbors and police observations of unusually high car traffic going to and coming from the suspect's home did not support application of the exigent circumstances exception. 528 Fed. Appx. 944, 950-51 (10th Cir. 2013). The court concluded that probable cause to believe that a suspect may be in possession of marijuana was insufficient to support a warrantless entry based on exigent circumstances because the exception is only available for serious crimes, and not for the crime of possessing small quantities of marijuana, which is typically a misdemeanor.[4] *Id.* at 949, 951. Similarly, in *White v. Stanley*, the Seventh Circuit held that "possession of a small amount of marijuana is far from that rare case" where probable cause of a minor offense justifies a warrantless entry, as discussed by the *Welsh* Court, and that the "upshot of all of this is that police who simply smell burning marijuana generally face no exigency and must get a warrant to enter the home." 745 F.3d 237, 241 (7th Cir. 2014); see *also United States v. Race*, 2015 WL 576171 at *21 (W.D.N.Y. Feb. 11, 2015) (collecting decisions), *adopted* 2015 WL 4678624 (Aug. 6, 2015) (finding odor of marijuana, sound of running footsteps,

---

[4] Pappas and Gagnon testified that the smell of burnt marijuana gave them no insight into the quantity of marijuana that might be present in the motel room, ECF No. 104 at 123:4-7, 233:18-22, and they acknowledged the possibility that all of the marijuana in the room had been consumed before they detected the odor in the hallway. *Id.* at 154:14-17, 233:23-234:1.

and untruthful statements of defendant insufficient to support probable cause of anything more than possession of marijuana, and did not support a warrantless entry into a house).

Two opinions, one from the Third Circuit and the other from the Eleventh Circuit, take a different tack. In *United States v. McMillion*, 472 Fed. Appx. 138, 141 (3d Cir. 2012), the court concluded that the odor of marijuana coming from an apartment, coupled with an occupant's admission that he was smoking marijuana, demonstrated probable cause of ongoing drug activity and the possibility that contraband would be destroyed if the police did not act immediately. The Eleventh Circuit reached the same outcome in *United States v. Floyd*, 247 Fed. Appx. 161, 167 (11th Cir. 2007), but with markedly different facts. There, police officers arrived at a home for purposes of effectuating an arrest warrant against a suspected drug dealer. Having smelled burning marijuana emanating from the house when the door was opened, the court concluded that the officers had probable cause to enter based on the information related to the drug dealing that supported the arrest warrant, together with the smell of burning marijuana coming from the home, reasonably led them to believe that a search of the home would reveal evidence of a crime. *See also United States v. Grissett*, 925 F.2d 776, 778 (4th Cir. 1991) (finding odor of burnt marijuana alone could justify warrantless entry).

Under Maine law, possession of less than two and a half ounces of marijuana is a civil infraction, 22 M.R.S.A. § 2383(1) (2016), and because Maine has legalized the use of marijuana for medical purposes, *see* 22 M.R.S.A. §§ 2421 *et seq.* (2016), the

possession and use of small amounts of marijuana by qualifying patients is legally permitted in some instances.[5]   *Id.* at §§ 2423-D, 2423-E.   The partial decriminalization of marijuana possession in Maine is reflected in Pappas' and Gagnon's belief that they did not have probable cause to arrest Aiken and Bonnett based on the smell of marijuana, but could have issued them a civil infraction summons.   The smell of burnt marijuana emanating from Room 218 indicated no more than a possibility that evidence of a crime more serious than the minor offense of possession of a small quantity of marijuana may be found in the motel room.   Thus, standing alone, the smell of marijuana did not establish probable cause, and additional reasonably trustworthy information was required.

Accordingly, I turn to consider the additional information known to the agents concerning Aiken's arrest in April 2014 and his nervous behavior that are cited by the Government in support of probable cause.

### iii.  Aiken's April 2014 Arrest and His Nervous Behavior

The agents decided to enter Room 218 because of Aiken's presence, and not because of the smell of burnt marijuana emanating from it.   ECF No. 104 at 53:23-54:4.   Agent Pappas testified that once he saw Aiken in Room 218, "I started to think that there was possibly more going on inside that room besides marijuana" because of Aiken's "ties with a larger scale drug trafficker from the April investigation."   *Id.*

---

[5]   Possession of a small amount of marijuana was defined as a crime under state law in Oklahoma and Illinois when *Mongold* and *White*, respectively, were decided.   The Seventh Circuit in *White* found it significant that once Illinois' soon-to-be-implemented medical marijuana program was in effect, "the smell of burning marijuana will not necessarily be indicative of any wrongdoing under Illinois law." 745 F.3d at 241.

at 52:5-12.  The agents possessed no information, however, that connected Aiken's arrest for trafficking heroin in April to his presence in Room 218 in November.  *See United States v. Gramlich*, 551 F.2d. 1359, 1362 (5th Cir. 1977) (finding no probable cause to search the residence of a defendant who was caught in the act of smuggling drugs into the country, because the government presented no specific information showing that evidence connected to the smuggling was likely to be found at the residence).  Accordingly, the agents' knowledge of Aiken's arrest in April did not, in combination with the smell of burnt marijuana, establish probable cause that evidence of a crime more serious than possession of a small quantity of marijuana might be found in Room 218.  This calculus is not changed by the added fact of Aiken's nervous behavior.

In describing Aiken's nervous behavior, Agent Gagnon explained:  "We kept trying to get [Aiken] to come to the door to speak to us regarding the marijuana use. He kept yelling out that he was getting dressed, getting his clothes on.  At one point he was bending over appearing to tie his shoes."  ECF No. 104 at 201:2-6.  This behavior appeared odd to Agent Gagnon, "[b]ecause we were just asking him to come out to the door to speak to us.  We felt it was odd that he was putting on and tying shoes just to come to the door."[6]  *Id*. at 201:11-14.  This behavior also made the agents fear that Aiken might be preparing to flee.  *Id*. at 171:1-5.

---

[6] Although Gagnon testified that "we were just asking [Aiken] to come out to the door to speak to us," ECF No. 104, 201:11-12, Agent Pappas' testimony was clear that Aiken and Bonnett were commanded to come out of the room to speak to the agents.  *Id*. at 57:19-22.

Considered in combination with the smell of burnt marijuana and the agents' knowledge of Aiken's drug-related arrest in April, Aiken's decision to get dressed and, therefore, his failure to immediately oblige the command that he exit the room did not establish probable cause to believe that evidence of something other than a minor crime would be found in the motel room.  As previously noted, the agents were at the door of Room 218 for less than one minute between when they first saw Aiken to when they ordered Aiken and Bonnett to exit.  The fact that Aiken failed to immediately exit the room, and instead attempted to dress and put on his shoes during this brief period, did not provide reasonably trustworthy information that, in combination with what the agents otherwise knew, established probable cause to believe that the room contained evidence of something more serious than a minor crime.

### 2.  The Exigent Circumstances

The Government asserts three bases for a finding of exigent circumstances:  (1) the risk that evidence in Room 218 would be destroyed; (2) the agents' concern for their own safety; and (3) the risk that Aiken and/or Bonnett would flee.  ECF No. 151 at 3-5.  The Magistrate Judge found that evidence does not establish sufficient exigent circumstances to support the warrantless search.   He explained:

> There was no realistic possibility that the occupants of the room would attempt to flee from a second-floor hotel room, when its only exit was under the control of law enforcement agents.  Nor did Aiken's presence or his nervous behavior necessitate immediate action by the agents. Since agents would presumably remain posted at the room while a search warrant was sought, the chance that evidence would be destroyed was also minimal.

ECF No. 142 at 4-5.   The Magistrate Judge further explained that to the extent the Government was also relying on officer safety as a reason for exigent circumstances, at the time the agents entered the motel room they could see that neither Bonnett nor Aiken were holding a weapon.  ECF No. 142 at 4, n.1.

### i. Destruction of Evidence

A reasonable fear on the part of the police that drug evidence will be destroyed can support a finding of exigent circumstances, *see United States v. St. Pierre*, 488 F.3d 76, 79 (1st Cir. 2007), and, as previously noted, the standard for determining whether exigent circumstances exist is "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant[,]" *United States v. Almonte*, 952 F.2d 20, 22 (1st Cir. 1991) (quotation omitted).   The Government must present "particularized, case-specific facts" showing "an objectively reasonable basis for concluding that the loss or destruction of evidence is likely to occur." *United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005); *see also United States v. Napue*, 834 F.2d 1311, 1326-27 (7th Cir. 1987) (holding that government must demonstrate an objective and reasonable fear that the destruction of evidence is imminent, or is already taking place).

The agents had a clear view of both defendants from the hall, and neither was observed to be acting in a manner that would support a reasonable fear that the destruction of evidence was threatened or imminent.  *See Napue*, 834 F.2d at 1326-27. The Government cites that drug evidence is easily destroyed, and that Aiken and Bonnett had access to a toilet and sink in the motel room which provided a ready

means to destroy drug evidence.  ECF No. 151 at 3-4.  This is not a case, however, in which ready access to a toilet or sink was accompanied by sounds or movements suggesting that the toilet or sink were being used to dispose of drugs.  The First Circuit has recognized that the exigent circumstances doctrine requires a showing that there is "a great likelihood that evidence will be destroyed[.]"  *United States v. Bartelho*, 71 F.3d 436, 442 (1st Cir. 1995); *see also King v. Commonwealth*, 386 S.W.3d 119, 123 (Ky. 2012) ("Exigent circumstances do not deal with mere possibilities, and the Commonwealth must show something more than a possibility that evidence is being destroyed to defeat the presumption of an unreasonable search and seizure").  The facts in this case do not demonstrate a great likelihood of evidence destruction, and show no more than a possibility that evidence could be destroyed.  Therefore, the Government has not presented "particularized, case-specific facts" sufficient to show that an exigency existed to justify a warrantless entry.  *See Samboy*, 433 F.3d at 158.

The Government also contends that the smell of burnt marijuana provided an objectively reasonable belief that evidence was being destroyed in that marijuana was being smoked.  ECF No. 151 at 3.  Although the agents testified that they smelled burnt marijuana, neither testified to having seen evidence of marijuana being actively burned once they encountered Bonnett and Aiken and were able to see into their room.  ECF No. 104 at 108:20-22.

### ii.  Concern for Officer Safety

The second reason the Government presses to establish exigent circumstances is concern for officer safety.  ECF No. 151 at 4.  To demonstrate exigent circumstances

on this basis, the Government must provide evidence to show that the agents "reasonably could have concluded that there was an imminent risk to [their] lives or safety[.]" *United States v. Tibolt*, 72 F.3d 965, 971 (1st Cir. 1995).

The Government argues that the recognized connection between drugs and violence, and Aiken's nervous behavior, combined to create a reasonable concern for officer safety. ECF No. 151 at 4. However, as the Magistrate Judge found, the agents saw no indication that either Aiken nor Bonnett was armed, *see* ECF 142 at 4, n.1, and neither Aiken nor Bonnett had taken any steps that presented a threat to the agents' safety, ECF No. 104 at 237:16-18. *See Hegarty*, 53 F.3d at 1378-79 (exigent circumstances found where armed suspect exhibited "violent, irrational and unpredictable behavior" and had barricaded herself inside a cabin containing firearms). Though the agents knew Aiken from his April drug arrest and felt that he was acting oddly, they had no information that he was in possession of a weapon, or had previously possessed a weapon or participated in any violence. ECF No. 104 at 126:8-17. The agents were not investigating Bonnett and Aiken based on a report that either had engaged in violent behavior. *See Beaudoin*, 362 F.3d at 66 (noting that the facts raised "the classic exigent circumstances situation" involving a risk of safety to officers because "the officers were investigating a report of drug activity and possible deadly criminal activity" in a motel room). Both agents testified that they did not feel threatened by either Aiken or Bonnett during the encounter. ECF No. 104 at 112:16-19, 237:16-18.

I conclude that the Government has not demonstrated that the agents held an objectively reasonable fear of an imminent risk to their safety sufficient to justify the warrantless entry.

### iii. Risk of Flight

The Government also argues that exigent circumstances are established by the risk that one or both of the defendants would attempt to flee.  ECF No. 151 at 5 n.3. The Government bears the burden of showing that circumstances supported the objectively reasonable conclusion that Aiken or Bonnett's attempted flight was "threatened and potentially successful."  *See McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 545 (1st Cir. 1996); *see also United States v. Weems*, 322 F.3d 18, 23 (1st Cir. 2003) (finding exigent circumstances where suspect was "evidently trying to escape"); *Parent v. U.S. Customs and Border Prot.*, 2012 WL 2567141 at *10 n.15 (D. Me. July 2, 2012) (finding exigent circumstances where suspect ran away from police toward back of residence).

The agents testified that Aiken's prior flight in connection with his arrest in April, and the fact that he was putting his shoes on, contributed to their concern. ECF No. 104 at 171:1-5, 202:8-14.  However, as the Magistrate Judge found, the agents were in control of the room's only exit, other than a second-story window.  ECF No. 142 at 4-5.  Further, Pappas testified that neither defendant made a move for the window.  ECF No. 104 at 159:18-19.  The Government's evidence does not establish that the agents held an objectively reasonable fear that Aiken and/or Bonnett's flight was threatened or imminent.

### 3. Conclusion Regarding Exigent Circumstances

"The ultimate touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)) (internal quotation marks omitted). Whether the agents had authority under *Terry* to order Aiken and Bonnett out of their motel room is not settled under First Circuit case law. *See Beaudoin*, 362 F.3d at 69 (treating a command by police that a suspect step out of the doorway of his motel room as "akin to the temporary detention involved in a *Terry* stop" when justified by objective safety concerns and information relating to an ongoing emergency).[7] The issue presented here, however, is whether the agents were justified in immediately entering the motel room when Aiken and Bonnett failed to comply with that order. The facts known to the agents at the time they crossed the threshold of Room 218 did not establish the exigent circumstances necessary to justify the warrantless entry. Notably, the possible criminal offense for which the agents had evidence—the use and/or possession of an unknown quantity of marijuana—did not point to serious criminal conduct having occurred, a fact which militates against a finding of exigent circumstances. *See Hegarty*, 53 F.3d at 1374 (recognizing that "certain mitigating factors may undermine a showing of exigent circumstances; for example, where the criminal offense was not sufficiently serious (a traffic violation), the opportunity afforded the suspect for peaceable surrender was inadequate, or the entry occurred

---

[7] *Beaudoin*, a 2-1 decision, was later vacated on other grounds by *Champagne v. United States*, 543 U.S. 1102 (2005). The majority opinion in *Beaudoin* noted that the case did not present "any abstract issue . . . about the application of *Terry* to persons in doorways absent the emergency and exigent circumstances present here." *Beaudoin*, 362 F.3d at 69.

in the nighttime.").  Further, the encounter lasted less than one minute, and therefore the agents afforded Aiken and Bonnett no more than a fleeting opportunity to voluntarily exit the room.  *See id.*  Finally, the Government has not established that any of the proffered exigencies—destruction of evidence, risk to officer safety, or risk of flight—existed to a degree sufficient to justify the entry.

Because the information known to the agents suggested no more than the commission of a minor offense and the Government has not established the necessary exigency, I conclude that the Government has failed to show that the agents' entry was justified under the exigent circumstances exception to the warrant requirement.

## C.    Consent

The Magistrate Judge found, under the totality of circumstances, that when Pappas asked if there were any drugs other than marijuana in the room, Aiken gave his unsolicited consent to a search of the room when he responded that there were no other drugs but the agents could search every drawer.  ECF No. 142 at 7-8.

Voluntary consent to search provides an exception to the warrant requirement, but the burden is on the Government to prove consent by a preponderance of the evidence.  *United States v. Forbes*, 181 F.3d 1, 5 (1st Cir. 1999).  The relied-upon consent must have been freely and voluntarily given, and "not the result of duress or coercion, express or implied[,]" *Bustamonte*, 412 U.S. at 248.  In objecting to the Magistrate Judge's decision on this issue, the defendants argue that Aiken's consent was not voluntary.

Some of the factors that bear on a finding of voluntariness of a consent are "age, education, experience, intelligence, and knowledge of the right to withhold consent[,]" as well as "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained . . . under inherently coercive circumstances." *United States v. Barnett*, 989 F.2d 546, 555 (1st Cir. 1993). The First Circuit has also observed that while the fact that the consenting party is in custody is not alone enough to demonstrate coercion, "sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody[.]" *Id.*

### 1. **Voluntariness of Consent**

In support of its claim that Aiken's consent was voluntary, the Government points to the fact that Aiken is an adult who speaks and understands English, and had previously interacted with the police. ECF No. 57 at 14. The Government also argues that the length of his detention was brief, that he was informed that the agents were not concerned about the marijuana in the room, and that he was not threatened by the agents. *Id.* Finally, and "[p]erhaps most importantly," the Government relies on the fact that Aiken's consent was unsolicited. *Id.*

As an initial matter, I find that Aiken's consent was not wholly unsolicited. Gagnon testified that the agents pointed specifically to the drawer and asked "how much crack was in the drawer or if there's any crack in the drawer[,]" and that Aiken "said something along the lines of there's no other drugs in the room, you can open all the drawers or you can look in all the drawers or something along those lines."

23

ECF No. 104 at 209:1-8.  Pappas' testimony on the point is less clear, but he testified that he "reiterated" his desire to search inside the drawer after Aiken had consented. *Id.* at 71:4-10 (Pappas explained, "My attention was immediately focused on the scale and I reiterated to the fact that I wanted to search the drawer underneath that scale and he again agreed with me that I could."). This indicates that Pappas had asked to look inside the drawer before Aiken gave his permission. Additionally, the wording of Aiken's response—"you can open all the drawers or you can look in all the drawers"—was framed as a response to the agents' expressed interest in searching a drawer or drawers. *Id.* at 209:6-8

The surrounding circumstances also militate against a finding of voluntary consent. Aiken, who was 22 years old at the time and had no criminal record, *see* ECF No. 150 at 8, became highly distressed after the agents entered the motel room, ECF No. 104 at 156:13-17. Pappas testified that he thought Aiken was operating in "condition black," meaning that he was irrational and "nothing[ was] making any sense" to him. *Id.* Because Aiken was yelling nonsensically, the agents restrained him by handcuffing him. *Id.* at 65:22-66:1. It was clear to Aiken that the agents had taken control of the motel room. *Id.* at 163:20-24. Aiken's consent to search the drawers was obtained: (1) within a few minutes of the initial entry by the agents, *id.* at 70:12; (2) after he had become highly emotionally distraught; (3) while he was handcuffed; (4) without *Miranda* warnings; and (5) in response to the agents' demand to know whether there was crack in the drawer, *id.* at 209:1-8.

Under the totality of the circumstances, the Government has not satisfied its burden of proving that the consent was not the product of "duress or coercion, express or implied[,]" *Bustamonte*, 412 U.S. at 248, and, therefore, voluntary.

## 2. Fruit of the Poisonous Tree

The defendants argue that even if Aiken's consent is treated as voluntary, the property seized during the search must still be suppressed under the fruit of the poisonous tree doctrine.[8]  ECF No. 150 at 8-17; ECF No. 152 at 7-8.  The Government bears the burden of proving that the consent was not tainted by the prior unlawful entry into the motel room.  *See Taylor v. Alabama*, 457 U.S. 687, 690 (1982).  In order to prove that a voluntary consent following an unlawful entry was valid, the Government must show that the causal link between the unlawful entry and the consent to search was sufficiently attenuated to purge the taint of the prior illegal act.  *See United States v. Cordero-Rosario*, 786 F.3d 64, 75-76 (1st Cir. 2015); *see also United States v. Goodrich*, 183 F. Supp. 2d 135, 145-46 (D. Mass. 2001).  The First Circuit analyzes this question under the factors set forth in *Brown v. Illinois*, 422 U.S. 590 (1975); namely, the time elapsed between the unlawful entry and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.  *See Cordero-Rosario*, 786 F.3d at 76.

---

8  The Magistrate Judge concluded that Bonnett lacks standing to press this issue, citing *United States v. Kimball*, 813 F. Supp. 95 (D. Me. 1993).  ECF No. 142 at 8.  However, *Kimball*'s recognition that Fourth and Fifth Amendment rights are personal, and cannot be vicariously asserted, does not prevent Bonnett from raising this argument.  Bonnett has individual standing to challenge the search of the motel room, as both he and Aiken had an expectation of privacy in the room.  Bonnett's assertion that the agents violated the Fourth Amendment here is personal, rather than vicarious.  *See Alderman v. United States*, 394 U.S. 165, 173-74 (1969).

The first of the *Brown* factors weighs in favor of suppression.  According to the agents' testimony, the consent to search the drawer was obtained from Aiken within three or four minutes of the unlawful entry into the motel room.  ECF No. 104 at 70:12.  Courts have found significantly longer periods of time insufficient to attenuate the link between the unlawful police action and the challenged fruit of that action.  *See, e.g., Taylor*, 457 U.S. at 691 (holding six hours insufficient to purge taint); *Brown*, 422 U.S. at 604 (two hours); *Goodrich*, 183 F. Supp. 2d at 147 (forty-eight minutes).  More than simply counting the minutes between events, however, the inquiry focuses on whether the prior unlawful act "significantly influenced or played a significant role in the subsequent consent."   *Cordero-Rosario*, 786 F.3d at 76 (quotations omitted).

In *Unites States v. Pena*, the court held that the defendant's consent to search was tainted by the prior unlawful entry, in part because the officer "exploited the illegality" of the unlawful entry by pointing to a cocaine wrapper that had been found during the unlawful search when asking for the defendant's consent.  924 F. Supp. 1239, 1253 (D. Mass. 1996).  The facts in this case are similar.  Here, Pappas and Gagnon pointed to the drawer directly beneath the scale that appeared to have cocaine residue on it, and asked whether there was crack in the drawer.  ECF No. 104 at 71:7-10.  The scale was not visible from outside the room.  *Id.* at 239:9-12.  The agents' discovery of the scale was a direct result of the unlawful entry, and the agents "exploited" that entry by pointing to the drawer, which prompted Aiken's consent.  *See Pena*, 924 F. Supp. at 1253; *see also Goodrich*, 183 F. Supp. 2d at 147 (finding

consent to search tainted by prior unlawful stop because defendant was aware that police had found a gun during illegal search).  In addition, the fact that Aiken was in handcuffs at the time that his consent was obtained, while not dispositive on the question of voluntariness, bears on the question of whether that consent was tainted, as the handcuffing was itself a direct result of the unlawful entry.  *See United States v. Campbell*, 920 F.2d 793, 798 (11th Cir. 1991) (finding significant that the defendant was in police custody at the time consent was obtained); *see also Goodrich*, 183 F. Supp. 2d at 147 (same).

The Government argues that the second *Brown* factor, the presence of intervening circumstances, weighs in favor of the Government because Aiken's consent was unsolicited.  ECF No. 57 at 14 n.7.  However, as discussed above, the evidence shows that the consent was not in fact wholly unsolicited.  The consent was given in response to a direct question about whether there were drugs in the drawer below the scale.  ECF No. 104 at 209:1-8.  A finding that the consent was truly unsolicited, so as to be sufficient to break the causal chain between the unlawful entry and the consent, requires far more, as illustrated by the cases cited by the Government.  In *United States v. Montgomery*, the defendant was arrested for possession of cocaine following an unlawful frisk by the police.  777 F.3d 269, 271 (5th Cir. 2015).  While in custody, the defendant "repeatedly requested that the officers access his cell phone" to remove photos that he wished to conceal from his father.  *Id.* at 275.  The police had not sought permission to search the phone, or indeed expressed any interest at all in its contents before the defendant broached the subject himself.

*Id.*  In accessing the phone, the police discovered child pornography.  *Id.* at 271.
Noting that the police were not searching for or expecting to find child pornography
when they detained the defendant, the court held that the defendant's unsolicited
request that the police access his phone was an independent, intervening event
sufficient to attenuate the discovery of the pornography from the earlier unlawful
frisk.  *Id.* at 276.  The court also treated the fact that the defendant was read his
*Miranda* rights as significant.  *Id.* at 275.

In *United States v. Mendoza-Salgado*, the court found that an unsolicited
consent offered by the suspect's wife was sufficient to attenuate the consent from a
prior illegal entry where the wife initially broached the subject of consent, the consent
was given thirty to forty-five minutes after the initial entry, the people present in the
house were unrestrained and free to use the kitchen and bathroom, the wife had been
assured that her husband had been taken into custody merely to verify his identity,
and she was given and signed a written consent form that explained her right to
withhold consent.  964 F.2d 993, 1012-13 (10th Cir. 1992).

In contrast with *Montgomery* and *Mendoza-Salgado*, Aiken's consent was
obtained within a few minutes of the entry; was obtained without the benefit of
*Miranda* warnings or an explanation that he could refuse consent; occurred while he
was handcuffed; and was elicited in response to questions from the agents about
whether there was crack in the drawer.  Aiken's consent cannot be said to be an
independent, intervening circumstance sufficient to purge the taint of the unlawful
entry into the motel room.

The third *Brown* factor—the purpose and flagrancy of the officers' misconduct—also weighs in favor of finding that Aiken's consent was tainted by the unlawful entry.  The agents' entry into the motel room was not a merely "technical" Fourth Amendment violation of the kind that the Supreme Court has noted is not susceptible to the deterrent effect of the exclusionary rule, such as when "officers in good faith arrest an individual in reliance on a warrant later invalidated or pursuant to a statute that subsequently is declared unconstitutional[.]"  *Brown*, 422 U.S. at 611-12 (Powell, J. concurring) (footnote omitted).  The agents entered the motel room without exigent circumstances.  While they did not draw their weapons or threaten the defendants, ECF No. 142 at 7, the agents did place Aiken in handcuffs and direct Bonnett to sit on the floor while demanding to know if there were any drugs present.  Even though not a "flamboyantly flagrant" violation of the Fourth Amendment, *see Goodrich*, 183 F. Supp. 2d at 148, the agents' conduct here is of a kind that can and ought to be deterred by application of the exclusionary rule, and therefore supports application of the fruit of the poisonous tree doctrine.

Examining the *Brown* factors as a whole, I conclude that even if Aiken's consent to search the motel room is treated as voluntary for purposes of the Fifth Amendment under *Bustamonte*, the property seized would nevertheless be suppressed as tainted fruit of the initial unlawful entry into the motel room.

## D.   Independent Source Doctrine

The Government argues that even if the agents' initial entry was unlawful and Aiken's consent was invalid, the evidence found in the motel room should not be

29

suppressed because the search warrant that was subsequently obtained for the room is nonetheless supported by probable cause.  ECF No. 57 at 15-17.  The First Circuit has laid out a two-part inquiry for determining whether the "independent source" doctrine applies to save a warrant that is issued on the heels of an unlawful search.  *See United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005).  Under *Dessesaure*, I must decide "(1) whether the agents' decision to seek the warrant was prompted by what they had seen during their initial entry, and (2) whether the affidavit [in support of the search warrant] contained sufficient facts to support probable cause when the offending facts were excised."  *Id.* (citations omitted).  I conclude that the first prong of the inquiry is determinative of the issue in this case.

The Government must show that the agents' decision to seek the warrant was not influenced by what they saw during their initial entry.  *See Dessesaure*, 429 F.3d at 369.  This prong calls for a factual determination of the agents' subjective intent, but that subjective intent "should not be proven by purely subjective means."  *Id.*  The Fourth Amendment demands that the Government demonstrate that the search pursuant to a warrant was "genuinely independent" of a prior unlawful entry.  *See Murray*, 487 U.S. at 542.  Specifically, I am "not bound by after-the-fact assurances of [the officers'] intent, but instead must assess the totality of the attendant circumstances to ascertain whether those assurances appear implausible."  *Dessesaure*, 429 F.3d at 370 (quotation omitted).

Pappas and Gagnon testified that at the time they entered the motel room, they intended to conduct a further investigation, whether by a consent search or

pursuant to a search warrant. ECF No. 104 at 63:12-14, 204:20-22. These assurances are inconsistent, however, with other evidence in the record. First, Pappas testified that he informed Gagnon that they would be seeking a search warrant only after Pappas had opened the drawer and identified the bag of cocaine base. *Id.* at 72:16-18, 117:1-3. Gagnon's testimony confirms that the first mention of a search warrant took place immediately after Pappas discovered the cocaine base. *Id.* at 230:5-10. Pappas also testified that his decision to apply for the search warrant when he did was "based on everything that was inside the room, the totality of the circumstances." *Id.* at 73:10-11. Thus, the facts suggest that the discovery of the cocaine base in the drawer contributed to the decision to seek a search warrant.

In addition, the claim that the agents would have sought a search warrant even if they had never entered the motel room is belied by the fact that the agents had not sought a search warrant for Room 216, the very room that was the initial focus of their investigation.[9] *See* ECF No. 104 at 168:22-24. The agents had received tips from two independent confidential informants that "big bags" of drugs were being sold from Room 216, they knew that the room was registered to a known drug trafficker, and they had been told by the motel clerk that the residents of the room had been problematic. ECF No. 50-1 at 3-4. That evidence was far more substantial and particularized than the knowledge the agents had about Room 218 at the time they entered it. The agents had not sought a warrant for Room 216 when their

---

[9]  Although the agents were planning to conduct a bail search of the room after learning who it was registered to, Pappas testified that he thought he needed a warrant to enter Room 216 when his knocking went unanswered. ECF No. 104 at 143:3-7.

31

knocking proved fruitless.  The assertion that they would nevertheless have sought a warrant for Room 218 had they never entered it is not plausible.

Under the totality of the circumstances presented here, I am not persuaded that the independent source doctrine saves the evidence found in the motel room from suppression.

## IV.  CONCLUSION

For the foregoing reasons, I do not adopt the Second Recommended Decision (ECF No. 142).  It is ORDERED that the defendants' motions to suppress evidence (ECF No. 49; ECF No. 53) are **GRANTED**.


**SO ORDERED.**

**Dated this 5th day of December 2016.**

<u>     **/s/ JON D. LEVY**    </u>
**U.S. DISTRICT JUDGE**